UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
THE UNITED STATES OF AMERICA

                                              07 Cr. 735 (LAK)

             -v-

PETER FOREMAN,

           Defendant

--------------------------------------------------------------x


## MEMORANDUM OF LAW AND FACT IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE


### INTRODUCTION

While walking down a street in the Bronx, Peter Foreman was stopped and searched by New York City police officers.  A gun was discovered on his person.  Mr. Foreman moved to suppress the weapon on the ground that the police lacked either probable cause to arrest and search him and/or reasonable suspicion to detain him and frisk him.  In response, the government argues only that the stop and frisk was permissible because the police reasonably suspected Mr. Foreman of criminal activity and were entitled to conduct a frisk because they believed he was armed and dangerous.

This is not a close case. The evidence adduced at the December 3, 2007 suppression hearing overwhelmingly demonstrated that the police lacked reasonable suspicion to believe that Mr. Foreman was either committing a crime and/or that he was armed and dangerous.  Even viewing the evidence in the light most favorable to the government, the testimony established

1

only that the police seized and searched Mr. Foreman because they thought he was "protecting something" or "favoring and grabbing something" and they wanted to know what that thing was. The detention was based on a vague, inchoate, and unarticulated suspicion of wrongdoing and the immediate frisk was conducted without even a claim, let alone an articulated factual basis, for surmising that Mr. Foreman might be armed or dangerous.   The Fourth Amendment, as construed by <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) and its progeny, prohibits exactly the sort of police action that occurred here.   Accordingly, the evidence must be suppressed.

## STATEMENT OF FACTS

### A.  Background

 Lieutenant Paul McMahon was the government's principal witness at the suppression hearing.  The testimony showed that he was solely responsible for the decision to stop and frisk Mr. Foreman.

Lieutenant McMahon is presently assigned to the Special Projects Unit of the 46th Precinct, a precinct-wide unit that targeted certain high-crime areas.  He spends about half his time in the precinct and half his time "on the street."  HT 3.  During McMahon's seventeen-year career as a police officer he has participated in thousands of arrests, including 400 to 500 gun arrests.  HT 4.

McMahon described the 46th Precinct as "relatively small" but having a "very high crime rate."   The precinct is "high in violent crime" and "very high" in drug arrests.  HT 5. When shown a picture of the blocks immediately surrounding the location where Mr. Foreman was arrested (Gov't Exh. 1),  McMahon identified a number of buildings where drugs were or had

2

been sold.  T. 12-15.  McMahon did not testify that the area was notable for any other sort of criminal activity.

Although he identified a number of drug locations in the vicinity of Field Place and the Grand Concourse, McMahon also acknowledged that the area depicted in Government Exhibit 1 was a "pretty heavy commercial area," with many stores, restaurants, bodegas and other grocery stores.  T.33.  He further admitted that were many large apartment buildings in the area and there were probably "thousands of people" who lived within a quarter mile of Field Place and the Grand Concourse.  He stated that at 9:30 on a Saturday night restaurants and stores were open in the area and that there would be a "lot of people walking around," albeit not as "crowded as the day."  He agreed that there was "nothing peculiar" about the sight of two people crossing the Grand Concourse at 9:30 at night."  T.40.

On the evening of April 21, 2007, Lieutenant McMahon was working at the 46th Precinct Station House when a call came in regarding a man with a gun.  Because he was working alone, McMahon asked Sergeant Kevin Hoare and Police Officer Rafael Tosado to accompany him on the "gun run."  HT 7.  The three drove from the station house in McMahon's unmarked Crown Victoria, an automobile which is "typically recognizable in the communities as a police vehicle." HT 8.  McMahon was driving with Sergeant Hoare sitting next to him.  Officer Tosado sat in the rear passenger seat behind Sergeant Hoare.  HT 8.  As the three traveled to the location where the gun had been reported, another radio call informed McMahon that the report of the gun had been determined to be "unfounded."  Accordingly, McMahon begin to drive back to the 46th Precinct.

On the way back, McMahon double-parked slightly to the south of the southeast corner of the Grand Concourse and Field Place.  He stopped the car because there were drug trafficking

locations in the area and he wanted to "see if there is anything of interest going on." HT 18.

**B. Initial Observations of Mr. Foreman**

McMahon was at the location for about 3-5 minutes when he observed two men–subsequently identified as Peter Foreman and Corey White-- walking east bound across the Grand Concourse at the intersection with Field Place. The men were on the east side of the Grand Concourse, separated from McMahon's car by about six lanes of traffic.

As McMahon looked at Mr. Foreman he "noticed what I thought was something somewhat unusual about Mr. Foreman's demeanor...I thought he seemed kind of stiff to me at first. He looked a little rigid. And he had–his left arm to me didn't look like he was–it looked like he was guarding. He wasn't walking with a natural gate (sic)." HT 20. McMahon further explained that "normally when somebody walks, you kind of with your arms relaxed. Not everybody, generally. And it appeared to me that he had like one arm in a little bit and he wasn't moving it from his side." HT 20.

As the two men approached an opening in an iron fence dividing the service lanes from the main lanes, McMahon "thought in my opinion he was more guarded than he had been prior to that." HT 20. As a result, McMahon told Sergeant Hoare and Office Tosado, "take a look at these guys or heads up on these guys."

On cross-examination, McMahon added several details regarding his initial observations. He recalled that when Mr. Foreman came across the main roads of the Grand Concourse, "there was a time when he kind of came a–I thought he was walking in a more natural way..." HT 50. McMahon also stated that when Foreman approached his car after crossing the Concourse, he saw his hand "cupped or cuffed into his waist. It was just kind of tucking in. It was making a

4

motion pulling in towards his hip."  McMahon recalled observing this motion "several times."[1]
HT 51.

On cross-examination, McMahon also admitted that he did not notice anything unusual about Mr. Foreman other than the manner in which he was holding his left arm.  Mr. Foreman was not walking unusually fast and he did not appear nervous, except for seeming somewhat "rigid."  He was wearing clothing appropriate for the weather.  McMahon had never seen Mr. Foreman before nor was he looking for anyone matching his description.  He did not have any reports of any crimes having recently been committed in the area.  McMahon could not tell if Mr. Foreman had anything in his pockets. HT 37-38.

Based on all of his initial observations, McMahon was unable to attribute any particularized suspicion of criminal activity to Mr. Foreman's actions.  When the prosecutor asked "what did your observations suggest to you."  McMahon could only say:

> It could have been a number of things at that point.  A number of things were going through my head.  I just thought it was a little–it was unusual enough that I continued to keep an observation on him and I thought maybe he was protecting something in his waist or it could have been nothing but at that point it was enough for me to–I kept my eye on him.  It was interesting enough that I just continued to watch him.  HT 21.

McMahon did not say what it was he thought Mr. Foreman might have been "protecting."

After crossing the Grand Concourse, the two men turned towards McMahon's car and then continued to walk down Field Place.  Because Mr. Foreman's behavior "continued" McMahon decided to "follow them and to probably–to make an approach."  HT 22.

---

[1] None of these details were included in the criminal complaint filed in the case.  In the complaint, McMahon mentioned only seeing Mr. Foreman walking with a "stiff left arm" as he crossed the Concourse and walked down Field Place.

**C.  The Stop and Frisk of Mr. Foreman**

Mr. Foreman and Mr. White walked down a very short block on Field Place and turned south on Ryer Avenue. As the two men turned the corner, Lieutenant McMahon directed Sergeant Hoare to say "hello or something" to them.  At this point, McMahon "wanted them to see me.  I wanted them to see us and know we were the police so I could get another good look coming at me." HT 22.  McMahon explained that the purpose of such an inquiry is to "judge somebody's reaction to your inquest and see if their demeanor changes, they get nervous, or anything else that causes your level of suspicion to rise." HT 25.

McMahon could not recall exactly what it was that Sergeant Hoare said to Mr. Foreman. He did not claim, however, that Sergeant Hoare issued any commands to Mr. Foreman or Mr. White or even posed a question that would require an answer.  However, when Hoare addressed Mr. Foreman, he looked at the police car and "at that point there is where his behavior changed to me in a marked way where I looked away and he got a lot–in my opinion I would characterize as a lot more nervous."  HT 25.  Lieutenant McMahon admitted that it was not uncommon for people to become nervous when addressed by police officers driving close to them.  HT 48.

According to McMahon, besides becoming nervous, Mr. Foreman "turned his hips and body away from us and he walked definitely ahead of the guy he was with and waved over his shoulder, We are good, Officer, or something to that effect."  HT 26.  McMahon further stated that as Mr. Foreman continued to walk, "his left hand I thought was kind of stuffed the whole time, made a definite reaching or grabbing motion toward his waistband."  HT 26.

McMahon was asked what "this action or interaction suggested to you?"  He replied "when he made that act there that is when I got really raised up and I thought he was grabbing for

6

something." HT 27. McMahon did not say what it was he thought Mr. Foreman might have

been grabbing.

Lieutenant McMahon did not ask Mr. Foreman what he was carrying and/or direct him to

show the police what he was carrying. Instead, as soon as Lieutenant McMahon observed the

actions described above: "I decided" that the police officers " were going to get out of the car and

search Mr. Foreman." He further explained that "I knew in my mind then that motion he made at

the corner I was definitely going to stop him." HT 50.

McMahon's intention in stopping Mr. Foreman was to "search the area that his left hand

was at." He was going to search that area because he wanted "to identify, if anything, what it

may be that he was favoring or grabbing." HT 50.

In response to McMahon's decision, Sergeant Hoare and Officer Tosado jumped out of

the car and went towards Mr. Foreman and Mr. White. There was no testimony that they issued

any commands to Mr. Foreman and/or that they drew their guns.

McMahon initially remained in the car and saw Sergeant Hoare "reach out his hands"

towards Mr. Foreman. After he saw that nobody was running or "trying to evade" the police

officers, McMahon left his car and went around to the street side. HT 28. "When I got out of the

car, Sergeant Hoare was on Mr. Foreman's waist like I said and in very short order he indicated

that he had a gun." HT 55. McMahon saw Sergeant Hoare "reaching into Mr. Foreman's

waist...almost immediately." HT 56.

The gun recovered by Sergeant Hoare was a small revolver, a few inches long. The gun

was contained in a black glove. Because Sergeant Hoare did not testify, there was no evidence as

to exactly where he found the gun and/or what he had felt before he removed the gun from Mr.

Foreman's clothing.

**D. Testimony of Police Officer Rafael Tosado**

At the conclusion of Lieutenant McMahon's testimony, the government initially indicated it intended to rest. However, after defense counsel stated he would want to call Police Officer Rafael Tosado, the government chose to call him.

Police Officer Tosado added little to the government's case because he played no role in the decision to follow and/or stop Mr. Foreman; he did not search Mr. Foreman; and he did not communicate any observations he may have made to either Sergeant Hoare or Lieutenant McMahon. The only action Tosado performed was to frisk Mr. White while Sergeant Hoare was searching Mr. Foreman. Officer Tosado's testimony was notable chiefly for the degree to which his observations contradicted the testimony of Officer McMahon.

According to Tosado, like McMahon, he first saw Mr. Foreman crossing the Grand Concourse in the "west lanes." HT. Lieutenant McMahon claimed that his attention was drawn to Mr. Foreman because he seemed "kind of stiff to me at first" and "it appeared to me that he like one arm in a little bit and he wasn't moving it from side to side." Tosado, however, insisted that he focused on Mr. Foreman because he kept "moving his left arm around." HT 67-68. Additionally, Tosado asserted that his attention was drawn to Mr. Foreman because of his "body language. He kept "looking around" and "looked behind him a few times." HT 68.

Tosado also provided a very different account of Mr. Foreman's actions when Sergeant Hoare spoke to him. Lieutenant McMahon testified that in response to Sergeant Hoare, Mr. Foreman kept walking away and merely turned his head to reply that "we're good." Tosado, however, declared that in response to Sergeant Hoare's comments, Mr. Foreman turned entirely

8

around so that he was facing back towards Field Place.  HT 65.

**E.  Testimony of Peter Foreman**

Mr. Foreman was the sole defense witness. He admitted that on the evening of April 21, 2007, he had a small gun that was tied up in a glove and secreted in the crotch area of his pants, "directly in front."  Mr. Foreman was wearing two pairs of underwear and the gun was in "a secure area in between the boxer brief."  HT 87.  Mr. Foreman explained that he could not have carried the gun in his waistband because he was wearing loose jeans and it "would have fell or I would continuously have to hold it."  HT 78.

Mr. Foreman stated that when Officer Hoare addressed him, he looked at the car and realized he was being spoken to by police officers.  Mr. Foreman "kept walking" because he didn't want to talk to the police.  HT 79. He denied that he made any grabbing motion towards his waist and/or pushed anything down his waistband when Sergeant Hoare spoke to him. Mr. Foreman did not make any such motions or actions because he was "not trying to be recognizable or draw any attention to myself."  HT 80.

Mr. Foreman further testified that a police officer recovered the gun from his crotch area. The gun was recovered after Sergeant Hoare "grabbed me [and] searched me."  HT 88.  Hoare conducted the search by first patting the area and then putting his hands into the crotch area.  HT 89.

**ARGUMENT**

**THE GUN MUST BE SUPPRESSED BECAUSE THE POLICE LACKED REASONABLE SUSPICION THAT MR. FOREMAN WAS ENGAGED IN CRIMINAL ACTIVITY AND ALSO DID NOT HAVE A REASONABLE BASIS TO BELIEVE THAT**

**HE WAS ARMED AND DANGEROUS**


**I.  THE POLICE LACKED REASONABLE SUSPICION TO DETAIN MR. FOREMAN**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amen. IV. Here, the government seeks to justify the search of Mr. Harry as reasonable on the ground that it was found pursuant to a lawful investigative detention and a limited protective search for weapons.  Government Letter of September 24, 2007 (hereinafter GL) at 2-5.

An investigative detention is constitutional "only if supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."  Reid v. Georgia, 448 U.S. 438, 440 (1980).  Thus, an officer who "stops" and briefly detains a person for questioning "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Terry v. Ohio, 392 U.S. 1, 21 (1968). An investigative detention must be based on something more substantial than an "inchoate and unparticularized suspicion or "hunch."  Terry, 392 U.S. at 27.  Rather, the police are obligated to articulate a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 418 (1981).  The ultimate test is to assess whether, given all the circumstances, there was reasonable suspicion of criminal activity viewed "from the standpoint of an objectively reasonable police officer." Ornelas v. United States, 517 U.S. 690, 696 (1996).

**A.  Lieutenant McMahon Was Unable to Articulate any Specific, Objective Facts that Mr. Foreman was Engaged in Criminal Activity**

10

The strongest evidence that there was no objective basis for the stop came from the government's primary witness, Lieutenant McMahon--the police officer solely responsible for the decision to stop and search Mr. Foreman. McMahon is a high-ranking police officer with a wealth of experience and training. Yet, he was unable to provide a "particularized and objective basis" for suspecting Mr. Foreman of criminal activity. To the contrary, Lieutenant McMahon's initial observations of Mr. Foreman led him to conclude only that he might have been "protecting something in his waist or it could have been nothing." Mr. Foreman's subsequent actions in response to Sergeant Hoare's remark made Lieutenant McMahon think that he was "grabbing for something." Based on these observations, McMahon decided to have Mr. Foreman stopped and searched purely because he wanted to see "what, if anything, he was grabbing or favoring."

Lieutenant McMahon's vague allegations regarding suspicions of some unspecified criminal activity are precisely the opposite of the "particularized and objective" basis for an investigative detention required by the Fourth Amendment. . See Brown v. Texas, 443 U.S. 47, 52 (1979)(no reasonable suspicion where officer testified that situation "looked suspicious" but was "unable to point to any facts supporting that conclusion"); United States v.Davis, 94 F.3d 1465, 1469 (investigative detention violated Fourth Amendment where officer testified only that he had "perception" that subject was engaged in criminal activity); United States v. Glover, 2006 Wl 1041148 (N.D. Texas 2006)(no reasonable suspicion where police officer failed to assert a belief that he had reasonable suspicion). Indeed, it is all but impossible to see how a Court could conclude that an "objectively reasonable" police officer had reasonable suspicion when the officer himself does not claim that he had such grounds

11

Even if Lieutenant McMahon's inability to articulate anything more than a vague suspicion is set aside, the various facts he testified to, viewed from a neutral perspective, do not come close, either alone or in combination, to satisfying the level of suspicion required for an investigative detention.

**B**.  **Walking with a "Stiff Arm" Does Not Create Reasonable Suspicion of Criminal Activity**

Lieutenant McMahon's observation that Mr. Foreman was walking with a "stiff arm" cannot contribute to a finding of reasonable suspicion.  There is nothing unusual about holding one's arm in this manner and McMahon did not testify that he associated the behavior with any form of criminal activity.  Indeed, as best as counsel can determine, there does not seem to be a single reported federal or state case from New York in which walking with a stiff arm has been cited as a basis for reasonable suspicion.  The few reported cases on this particular behavior reach the opposite conclusion.  People v. Nelson, 477 N.Y.S. 2d 295, 297 (1st Dept. 1984)("keeping one's arm very stiff and tight to one's body is at best innocuous behavior...");  People v. Cooper, 844 N.Y.S. 2d 546 (App. Term, 1st Dept. 2007)(defendant's walking with a rigid left arm pressed against his left side as if holding something in place at 2:00 a.m. in a high crime area, even when coupled with other factors, did not rise to level of reasonable suspicion).

**C**.. **Becoming "Nervous" When Confronted by Police Officers Does Not Create Reasonable Suspicion of Police Activity**

The claim that Mr. Foreman became "nervous" when he realized that a carful of police officers were following him and speaking to him also cannot be used as a basis for finding reasonable suspicion.  As Lieutenant McMahon himself conceded, it is not unusual for persons to

become nervous in such a situation.  See United States v. McKoy, 428 F.3d 38, 40 (1st Cir.

2005)("Nervousness is a common and entirely natural reaction to police presence); Washington

v. Lambert, 98 F.3d 1181, 1192 (9th Cir. 1996)("many innocent black men, and even many

innocent white men, will appear nervous when they notice they are being followed by the

police...").

_____Mr. Foreman's decision to keep walking after Sergeant Hoare said "hello" to him is also

not a grounds for finding reasonable suspicion.  Mr. Foreman had every right to not respond to

the police overtures and, therefore, his decision to do so cannot be used to create reasonable

suspicion.  See Florida v. Royer, 460 U.S. 491, 498 (1983)("[A person] may not be detained even

momentarily without reasonable, objective grounds for doing so; and [the person's] refusal to

listen or answer does not supply those grounds"); Illinois v. Wardlow, 528 U.S. 673 (2000)

(person has right to go about his business or to stay put and remain silent in the face of police

questioning).

### D. Testimony that the 46th Precinct Was a "High Crime" Area Does Not Create Reasonable Suspicion of Criminal Activity

Lieutenant McMahon's description of the 46th precinct as a "high crime" area and his

identification of a number of buildings on Creston Avenue, Ryer Avenue, and the Grand

Concourse as drug locations also may not contribute to a finding of reasonable suspicion.  It is

true that, under appropriate circumstances, the identification of a particular location as a "high

crime area" may factor into a reasonable suspicion analysis.  See Illinois v. Wardlow, 528

However, the citing of an area as "high crime' requires careful examination by the court, because

such a description, unless properly limited and factually based, can easily serve as a proxy for

13

race or ethnicity." United States v. Caruthers, 458 F.3d 459, 468 (6th Cir. 2006), quoting United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. en banc)(2000). That is precisely what happened here. Lieutenant McMahon labeled the entire 46th precinct, a neighborhood with tens of thousands of people (almost all of color) as a "high crime" area. It is offensive and absurd to insinuate that everyone in that area should be viewed with greater suspicion.

Nor did the government make any effort to link Mr. Foreman's behavior to McMahon's characterization of the arrest scene as a "high crime" area. Drug dealing was the only criminal activity that Lieutenant McMahon identified as occurring with special prevalence in the vicinity of Field Place and the Grand Concourse. But, McMahon made no claim that he suspected Foreman of narcotics activities nor did he otherwise claim that the area's high crime rate factored into his decision to stop and search Mr. Foreman. Cf. United States v. Magda, 547 F.2d 756 (2d Cir. 1976)(investigative detention of person based on suspicion of narcotics activity upheld in part because specific area where defendant was found had a high incidence of narcotics dealing).

**E. Lieutenant McMahon's Observations that Mr. Foreman "Bladed" his Body and made a "Grabbing or Reaching" Motion Towards His Waist Does Not Create Reasonable Suspicion Where Lieutenant McMahon, himself, did Not Allege that the Motions Caused Him to Suspect Any Particular Criminal Activity**

Lieutenant McMahon asserted that when Sergeant Hoare spoke to Mr. Foreman, he "bladed" his body and made some sort of "grabbing or reaching" motion at his waist. The government touts this supposed action as "critical" to the reasonable suspicion analysis.[2]

---

[2] Notably, the government's pre-hearing letter posited that the testimony would show that Mr. Foreman "appeared to push an object from his waistband down into his pants." The government viewed this projected testimony as particularly important, distinguishing it from a situation where a person "simply touch[ed] his waistband." GL at 6, fn.1.

For purposes of reasonable suspicion, the movements described by Lieutenant McMahon are, at best, ambiguous.  There are many reasons, most of them non-criminal, why a person might reach towards his waistband.  Accordingly, many courts have refused to find reasonable suspicion premised on such gestures.  See e.g.  United States v. Mckoy, 428 F.3d 38 (1ˢᵗ Cir. 2006)(no reasonable suspicion where defendant twice leaned and reached towards center console even though officer suspected he might have been reaching for weapon);  United States v. Davis, 94 F.3d 1465 (6ᵗʰ Cir 1996)(no reasonable suspicion where defendant refused police command to stop and take hands out of pocket even where officer testified that presence of hands in pocket led him to believe defendant might be hiding a firearm); United States v. Parker, 1999 Wl 997282 (E.D.N.Y. 1999)(suspect's "blading" of police officer and simultaneously  placing hand on right hip did not support an investigative stop in absence of other particularized facts that would support suspicion of criminal activity even though police officers testified that they recognized behavior as attempt to conceal weapon).

There are also, of course, situations in which a suspect's motion towards his waistband contributes to a police officer's reasonable suspicion that he is reaching for a gun or some other weapon. In such cases, however, the finding of reasonable suspicion is invariably made because the police officer testified that, based on his training, experience, and observations, he believed the particular gesture at issue indicated a weapon.  See e.g. United States v. Padilla, 2007 WL 1958894 (E.D.N.Y. 2007)( reasonable suspicion where detective "testified convincingly that defendant's hand gesture towards his waistband was a familiar one that he had seen numerous times in his experience as a police officer–that of someone adjusting a gun tucked into his pants"); United States v. Mayo, 361 F.3d 802 (4ᵗʰ Cir. 2004)(officer's observation that suspect had something

15

"heavy" in his pocket and was pushing his hand down into his pocket contributed to reasonable suspicion where officer testified that "movement was consistent with an individual's effort to maintain control of a weapon while moving"); United States v. Ward, 1999 WL 130653 (S.D.N.Y. 1999)(where defendant reached toward front pocket with his left hand and at same time reached behind back with his right hand, finding of reasonable suspicion where officer testified he believed that "defendant was reaching for some type of weapon").

There was, of course, no testimony from Lieutenant McMahon that the motions he observed caused him to suspect that Mr. Foreman had a gun or, indeed, led him to suspect any particular criminal activity. Rather, Lieutenant McMahon, who has made 400-500 gun arrests, was able to determine only that Mr. Foreman was "grabbing for something." If his training and experience gave him any reason to believe Mr. Foreman was grabbing for a gun (or doing anything else illegal), McMahon surely would have said so at the hearing. Accordingly, there is no objective basis for concluding that McMahon witnessed a gesture that gave rise to a reasonable suspicion that Mr. Foreman was carrying a gun.

### F. The Totality of the Circumstances Do Not Create Reasonable Suspicion

Finally, there are situations in which even innocuous, overtly legal behaviors and circumstances may add up to reasonable suspicion. See United States v. Sokolow, 490 U.S. 1 (1987). In this regard, police officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." United States v. Arvizu, 534 U.S. 266, 273 (2002). See also United States v. Cortez, 449 U.S. 411, 418 (1980)(law enforcement officers are permitted to draw 'inferences and deductions that might well elude an untrained person").

16

In this case, however, Lieutenant McMahon made no effort to explain what, if any, deductions and inferences he made from the combination of circumstances that led him to conclude that he had reasonable suspicion for an investigation detention. The absence of such testimony is fatal. Before a court may find reasonable suspicion from a police officer's inferences and deductions: "[T]hose inferences and deductions must be *explained.* Specifically, the Fourth Amendment requires an officer to explain *why* the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." United States v. Johnson, 171 F.3d 601, 604 (8ᵗʰ Cir. 1999); People v. LoCicero, 453 Mich. 496, 505 (Mich. Sup. Ct. 1996)(where government attempts to justify search based on police officer's inference of criminal activity, officer is "obliged to articulate how the behavior that he observed suggested, in light of his experience and training, an inference of criminal activity").

The need to explain the significance of overtly legal behavior is spelled out in many Supreme Court cases. Compare United States v. Ortiz, 422 U.S. 891, 898 (1975)(government could not justify stop of vehicle based on various factors on which officers have relied in deciding which cars to stop for suspicion of harboring aliens where "the officers [at the hearing] advanced no special reasons for believing respondent's vehicle contained aliens) with United States v. Cortez, supra (police officer's testimony about inferences they were able to draw from facts based on their training and experience supported finding of reasonable suspicion) and Ornelas v. United States, 517 U.S. 690 (1996)(loose screw in panel together with other circumstances provided probable cause for search of car for narcotics where narcotics investigator testified about significance of facts with respect to possible concealment of drugs). Given these cases, the government cannot ask the Court to find reasonable suspicion based on its own suppositions as to

17

what might be inferred from the facts described by McMahon.

## II.  THE SEARCH OF MR. FOREMAN WAS UNCONSTITUTIONAL BECAUSE THE POLICE LACKED A REASONABLE BASIS TO BELIEVE HE WAS ARMED AND DANGEROUS

The gun seized from Mr. Foreman would have to be suppressed even if there had been a legitimate basis for an investigative detention.  A police officer is not entitled to search, or even pat frisk, every person who is detained for investigation.  "In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."  Sibron v. New York, 392 U.S. 40, 64 (1968).  See also Adams v. Williams, 407 U.S. 143, 146 (1972)(even where police officer has basis for lawful investigatory stop, he may search for weapons only where he "has reason to believe that the suspect is armed and dangerous").

### A.  Lieutenant McMahon Failed to Allege that he Believed Mr. Foreman Was Armed and Dangerous and Did not Provide Any Facts That Would Have Supported Such a Conclusion

Lieutenant McMahon utterly failed to articulate any facts or inferences which would support a reasonable suspicion that Mr. Foreman was armed.  As discussed above, at the point he ordered Mr. Foreman to be searched, the very most Lieutenant McMahon was able to infer from all of the attendant circumstances was that Mr. Foreman was "grabbing for something" and he wanted to find out what it was. This vague suspicion–which does not even include a conclusory claim about a fear of a weapon-- is patently inadequate to satisfy the demand for particular, articulable facts that a suspect is armed.  See United States v. Davis, 94 F.3d 1465, 1469 (frisk of defendant illegal where officer claimed only to have "perception" based on his experience and training that

18

defendant might be armed).   Moreover, it is obvious that an  officer cannot have a reasonable

suspicion that a person is armed and dangerous when in fact he has no such suspicion.  This fact is

implicit in Supreme Court jurisprudence.  United States v Lott, 870 F.2d 778, 784 (1st Cir. 1979),

citing cases.

**B.  The Frisk of Mr. Foreman Was an Impermissible General Search For Evidence of a Crime**

The weapon must also be suppressed because the frisk of Mr. Foreman was explicitly

aimed at discovering evidence, rather than limited to a protective frisk attendant to an inquiry.

A general search for evidence in the guise of a Terry stop is unconstitutional. Adams v.

Williams, 407 U.S. 143, 147 (1972)(weapons search must be limited to protective aims because

purpose of limited protective search "is not to discover evidence of crime...."); Ybarra v. Illinois,

444 U.S. 85, 93-94 (Terry provides no support for "any search whatever for anything but

weapons").

Here, Lieutenant McMahon, with commendable candor, admitted that the sole reason he

determined to stop and search Mr. Foreman was to "identify" what it was he was "favoring or

grabbing."  The evidence, therefore, must be suppressed.  Sibron v. New York is directly on point.

In Sibron, a police officer observed Sibron talking to a number of narcotics addicts over a period of

eight hours.  When the officer eventually approached Sibron, he "mumbled something" and

reached into his pocket.  The police officer then thrust his hand into the same pocket and

uncovered some glassine envelopes of heroin.  At the suppression hearing, the officer did not claim

that he feared Sibron was going for a weapon when he put his hand in his pocket.  Rather, he made

it "abundantly clear" that his purpose in conducting the search was to look for drugs.  The Supreme

Court found that this search violated the Fourth Amendment because it was clear that the officer's purpose was to search for evidence rather than based on a genuine concern that Sibron was armed and dangerous.

### C.  The Failure to Make Inquiry of Mr. Foreman Before Searching Him Demonstrates that the Frisk was Conducted in Violation of <u>Terry</u>

The fact that Lieutenant McMahon did not even attempt to make any inquiry of Mr. Foreman before he ordered him to be seized and searched is yet another ground for suppressing the weapon.  If Lieutenant McMahon had only wanted to know what Mr. Foreman was favoring or grabbing, he could have just asked him.  "An officer is not warranted in relying upon circumstances deemed by him suspicious, when the means are at hand to either verify or dissipate those suspicions without risk."  <u>United States v. Clay</u>, 640 F.2d 157, 161 (6th Cir. 1981).  <u>See also</u> <u>United States v. Magda</u>, 547 F.2d 756, 759 (2d Cir. 1976)(upholding investigative detention where inquiry was reasonably related to the observations which had caused police to become suspicious).

### D.  Because the Police Lacked Reasonable Suspicion for a Detention, the Frisk of Mr. Foreman Cannot be Justified on the Grounds that the Police Feared for their Safety.

Finally, in the absence of reasonable suspicion, the frisk of Mr. Foreman cannot be upheld even if a reasonable officer would have harbored a fear for the safety of himself and his fellow officers in encountering Mr. Foreman.  <u>See</u> <u>United States v. Burton</u>, 228 F.3d 524, 528 (4th Cir. 2000)(where consensual encounter with suspect did not provide police officer with reasonable suspicion of criminal activity, he could not frisk suspect even though suspect refused to remove hand from pocket and officer felt "uneasy" about his safety).  Without reasonable suspicion, the officers' alternative was to "avoid a person [they] considered dangerous."  <u>Terry</u>, 392 U.S. at 32.

**CONCLUSION**

For the foregoing reasons, the gun seized from Mr. Foreman on April 21, 2007 must be suppressed.

Respectfully submitted,


Mark B. Gombiner
Attorney for Peter Foreman

cc: A.U.S.A. Lee Renzin