UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :

          -v-                             :           07 Cr. 735 (LAK)

PETER FOREMAN,                     :

                   Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x


**POST-HEARING MEMORANDUM OF LAW OF THE UNITED STATES OF
AMERICA IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**


                                            MICHAEL J. GARCIA
                                            United States Attorney
                                            Southern District of New York
                                            Attorney for the United States of America

LEE RENZIN
ALEXANDER J. WILLSCHER
Assistant United States Attorneys

    - Of Counsel -

## TABLE OF CONTENTS

**THE EVIDENCE AT THE HEARING**..................................................................................2

    A.    The Testimony of the Police Officers...........................................................2

    B.    The Testimony of the Defendant...................................................................5

**ARGUMENT**............................................................................................................................6

THE DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE
SHOULD BE DENIED BECAUSE THE RECORD DEMONSTRATES
THAT THE OFFICERS HAD REASONABLE SUSPICION TO STOP
AND FRISK HIM......................................................................................................6

**CONCLUSION**......................................................................................................................12

## TABLE OF AUTHORITIES

Adams v. Williams, 407 U.S. 143, 92 S. Ct. 1921 (1972)..................................................8

Dasher v. Hughes, No. 95 Civ. 3913 (WK),
    2000 WL 726865 (S.D.N.Y. June 6, 2000)..................................................11

Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673 (2000)..................................................7, 11

Ornelas v. United States, 517 U.S. 690, 116 S. Ct. 1657 (1996)..................................................9

People v. Cooper, 844 N.Y.S.2d 546, 17 Misc. 3d 44 (1st Dep't 2007)..................................................11

People v. Nelson, 102 A.D.2d 765, 477 N.Y.S.2d 295 (1st Dep't 1984)..................................................11

Sibron v. New York, 392 U.S. 40, 88 S. Ct. 1889 (1968)..................................................10

Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968)..................................................*passim*

United States v. Alexander, 907 F.2d 269 (2d Cir. 1990)..................................................12

United States v. Bayless, 921 F. Supp. 211 (S.D.N.Y. 1996)..................................................6

United States v. Brignoni-Ponce, 422 U.S. 873, 95 S. Ct. 2574 (1975)..................................................7

United States v. Davis, 94 F.3d 1465 (10th Cir. 1996)..................................................10

United States v. Johnson, 171 F.3d 601 (8th Cir. 1999)..................................................10

United States v. McKoy, 428 F.3d 38 (1st Cir. 2005)..................................................10

United States v. Mireles, 583 F.2d 1115 (10th Cir. 1978)..................................................12

United States v. Moore, 817 F.2d 1105 (4th Cir. 1987)..................................................12

United States v. Oates, 560 F.2d 45, 63 (2d Cir. 1977)..................................................8

United States v. Padilla, No. 06 Cr. 824,
    2007 WL 1958894 (E.D.N.Y. June 29, 2007)..................................................10

United States v. Parker, No. 99 Cr. 123,
    1999 WL 997282 (E.D.N.Y. Oct. 18, 1999)..................................................10

United States v. Santana, 485 F.2d 365 (2d Cir. 1973)..................................................8

United States v. Scopo, 19 F.3d 777 (2d Cir. 1994)..................................................11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA         :         07 Cr. 735 (LAK)

       -v-                       :

PETER FOREMAN,                   :

             Defendant.   :

------------------------------X

### POST-HEARING MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The Government respectfully submits this memorandum of law in response to the defendant's post-hearing memorandum of law ("Def. Br.") and in further support of the Government's opposition to the defendant's motion to suppress physical evidence.

On December 3, 2007, the Court held a hearing on the defendant's motion. The facts articulated by the Government's witnesses established that by the time the New York City Police Department officers (the "Officers") stopped and frisked the defendant, they reasonably suspected he was involved in criminal activity, namely, the possession of a firearm, and accordingly, they had reason to believe he was armed and dangerous.

In his post-hearing memorandum, the defendant suggests that the test for finding reasonable suspicion is far more onerous than the law in fact requires. For the reasons set forth below and in the Government's pre-hearing letter of September 24, 2007 ("Sept. 24, 2007 Gov't Ltr."), the defendant's motion should be denied.

1

## THE EVIDENCE AT THE HEARING

The Government called two witnesses, Lieutenant Paul McMahon and Police Officer Rafael Tosado of the New York City Police Department ("NYPD"). The Defense called one witness, the defendant.

### A.   The Testimony of the Police Officers

On the evening of April 21, 2007, shortly before the defendant's arrest, Lieutenant Paul McMahon, Sergeant Kevin Hoare, and Officer Rafael Tosado were patrolling in an unmarked police car. The Officers were parked on the Grand Concourse several car-lengths south of the well-lit corner of Field Place, in the confines of the 46th Precinct. (Tr. 7, 9, 15-16, 18).

The arrest took place in a high-crime area. Lieutenant McMahon testified that the 46th Precinct – one of the city's smallest – routinely ranks at the top of citywide crime statistics, including for violent crimes such as shootings and homicides, as well as for narcotics offenses. (Tr. 5). Lieutenant McMahon then identified a number of locations within several blocks of where the arrest took place as noteworthy for their high level of criminal activity. (Tr. 12-15).

The Officers first noticed the defendant as he crossed the Grand Concourse with another person, Corey White. (Tr. 18-19). Lieutenant McMahon "noticed what I thought was something somewhat unusual about Mr. Foreman's demeanor so I kept an eye on him." (Tr. 20). Lieutenant McMahon described and demonstrated physically the defendant's gait as the defendant crossed the street. Specifically, the defendant "seemed kind of stiff . . . a little rigid . . . his left arm to me didn't look like he was – it looked like he was guarding. He wasn't walking with a natural gate." (Tr. 20). The defendant's body motion became even more guarded as he crossed a fence separating the express and local lanes on the northbound side of the Grand

2

Concourse. (Tr. 21). Lieutenant McMahon advised his fellow officers to pay attention to the defendant and White. (Tr. 21, 51). Lieutenant McMahon acknowledged that at this point, he thought the defendant might be "protecting something in his waist or it could have been nothing but at that point it was enough for me to – I kept my eye on him." (Tr. 21). For that reason, he decided to observe the defendant further. (Tr. 21).

Officer Tosado also observed the defendant walking across the Grand Concourse, and explained why he noticed the defendant: "With his left hand he kept adjusting something. [There a]ppeared to be something in his waist area." (Tr. 60; see also Tr. 70).[1] Officer Tosado physically demonstrated what he observed and simultaneously explained that "[a]s he was walking, with his left hand he was adjusting something in that area, left front." (Tr. 61).

The Officers followed the defendant and his companion as they walked east on Field Place. (Tr. 22). Officer Tosado testified that from his vantage point behind the defendant he "kept seeing [the defendant's] left elbow as if he's adjusting something in his left waist area." (Tr. 70). Lieutenant McMahon then positioned his car diagonally along the corner of Field Place and Ryer Avenue. (Tr. 22). His purpose in doing so was two-fold: he wanted to get a better view of the defendant and he wanted the defendant to see the Officers. (Tr. 22, 47). Lieutenant McMahon testified that when the defendant saw the Officers, he appeared nervous. (Tr. 47). Sergeant Hoare then asked the defendant and White a question, along the lines of, "how are you doing?" (Tr. 35, 62). The defendant answered in a dismissive, odd manner. (Tr. 49, 66). At the same time, he turned the left side of his body – the side that was facing the Officers – away from

---

[1] Lieutenant McMahon and Officer Tosado both testified that from their vantage point, the defendant was walking diagonally across the Grand Concourse. (Tr. 41, 61). Accordingly, they were able to view the front-left portion of the defendant's pelvis area.

3

their view and began to walk with a quickened pace, away from his companion. (Tr. 26).

Most significantly, both Officers testified that in response to Sergeant Hoare's question, the defendant reached his left hand directly toward the area they had watched him favoring throughout their observation. Lieutenant McMahon testified that as the defendant walked away, "his left hand I thought was kind of stuffed [sic] the whole time, made a definitive reaching or grabbing motion toward his waistband." (Tr. 26). Lieutenant McMahon then physically demonstrated what he observed, which the Court summarized as follows: "Right hand over the head with the left hands clutching the area of his belt on the left side of his belt." (Tr. 27).

Officer Tosado's recollection of the defendant's motion following Sergeant Hoare's question was consistent with Lieutenant McMahon's. Officer Tosado testified that "[a]s soon as Sergeant Hoare asked him a question, his left hand went to his left waist area." (Tr. 66). Officer Tosado further explained that the defendant's "left hand went to his waist area . . . . He kind of turned around keeping his left side of the body away from our car." (Tr. 62-63). Officer Tosado also provided the Court with a demonstration of what he observed, and while doing so, explained that the defendant "grabs his left area and turned completely around." (Tr. 63).[2]

Once the defendant made this motion, Lieutenant McMahon – a seventeen-year NYPD veteran who had made thousands of arrests, including hundreds of gun arrests – "got really raised up and I thought that he was grabbing for something." (Tr. 27). According to Lieutenant

---

[2] Officer Tosado testified that following Sergeant Hoare's question, the defendant turned 180-degrees and subsequently faced north on Ryer Avenue, which was inconsistent with Lieutenant McMahon's testimony that the defendant turned the left side of his body away from the Officers but still faced south. The Officers' different recollections regarding this isolated detail in no way undermines the Officers' identical recollections of the defendant's key actions, including, most significantly, his motion toward the area where the gun was ultimately recovered.

4

McMahon, "the motion that he had made when we first called to him definitely alerted me." (Tr. 28). Officer Tosado explained the inference he drew from the defendant's actions: "Because the way he was acting, it appeared to us he had a weapon on him." (Tr. 71).

Without hesitation, Sergeant Hoare and Officer Tosado jumped out of the car and approached the defendant. (Tr. 71; see also Tr. 50, 66).[3] Sergeant Hoare was closer to the defendant, so he stopped, frisked, and recovered the firearm from the defendant. (Tr. 28, 55, 66, 71). Lieutenant McMahon observed Sergeant Hoare recover the firearm from the very spot that the Officers had observed the defendant favoring throughout their observation. (Tr. 28, 55-56).

### B. The Testimony of the Defendant

The defendant corroborated much of the Officers' testimony. For example, he conceded that when asked a question by Sergeant Hoare, he kept walking rather than engaging in conversation. (Tr. 79, 80). He also conceded that when Sergeant Hoare stopped and frisked him, Sergeant Hoare went directly to the area where the firearm was located. (Tr. 88-89).

The defendant testified that when Sergeant Hoare asked him a question at the corner of Field Place and Ryer Avenue, he recognized the occupants of the car as police officers. (Tr. 79). This testimony directly contradicted the defendant's sworn statement in his affidavit that, "[a]s I walked down Ryer Avenue, a car pulled alongside of me. The car was not marked as a police car and I did not know who the occupants of the car were." (GX 8, at ¶ 5).

Most significantly, the defendant testified that he never pushed, reached, or otherwise motioned toward the area where he was secreting the firearm and ammunition (Tr. 80), although

---

[3] The defendant's insistence that Lieutenant McMahon ordered the stop-and-frisk (Def. Br. at 2, 7, 11, 18), is belied by the hearing testimony.

5

he did not include this denial in his affidavit. That area, according to the defendant, was the front portion of his boxer briefs directly next to his body. (Tr. 87). The defendant admitted the firearm was not secured by a holster or rope of some type, and that it was not lodged in his waistband. (Tr. 88). Rather, according to the defendant, the firearm was secured by a "band" located in the "crotch area" of his briefs. (Tr. 88).

## ARGUMENT

### THE DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE SHOULD BE DENIED BECAUSE THE RECORD DEMONSTRATES THAT THE OFFICERS HAD REASONABLE SUSPICION TO STOP AND FRISK HIM

The defendant's motion to suppress the gun that the Officers recovered from him should be denied. The Officers' testimony amply established that during the course of their observation of the defendant, they developed a reasonable suspicion that the defendant was engaged in criminal conduct. Because the conduct they suspected the defendant of engaging in involved a firearm, one of the Officers properly conducted a limited protective frisk of the area where the Officers suspected the defendant was secreting a firearm.

Measured against the applicable legal standards, see Sept. 24, 2007 Gov't Ltr. at 2-5 (discussing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968) and its progeny), the testimony of Lieutenant McMahon and Officer Tosado demonstrates that the Government established by a preponderance of the evidence, see United States v. Bayless, 921 F. Supp. 211, 213 (S.D.N.Y. 1996), that the stop and frisk of the defendant was proper. The Officers' testimony was consistent in all material respects and left no question that they had reasonable suspicion that the defendant was carrying a firearm by the time Sergeant Hoare stopped and frisked the defendant.

At the outset, this arrest took place in a high-crime neighborhood within a high-crime precinct – a characterization that Lieutenant McMahon supported with detailed testimony and which should be taken into account when assessing reasonable suspicion. (Tr. 5, 12-15); see Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000). When both Lieutenant McMahon and Officer Tosado first observed the defendant acting in a manner they deemed possibly suspicious (Tr. 20-21, 60-61), the Officers chose simply to continue to observe him. They followed the defendant briefly in their car and then positioned the car on the corner of Field Place and Ryer Avenue such that the defendant would be able to see the Officers and the Officers could continue to observe the defendant. (Tr. 22, 47). Sergeant Hoare then employed another investigative tactic – he posed a routine question to the defendant. (Tr. 35, 62).

Lieutenant McMahon's and Officer Tosado's testimony was replete with "specific and articulable facts," Terry, 392 U.S. at 21, 88 S. Ct. at 1880, describing the defendant's verbal and physical responses to Sergeant Hoare's question. (Tr. 26-28, 49, 62-63, 66). These "specific and articulable facts," together with the Officers' earlier observations, gave rise to the "rational inference" that the defendant might have been possessing a firearm – an inference that Officer Tosado specifically explained to the Court. See Tr. 71 ("Because the way he was acting, it appeared to us he had a weapon on him."); United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S. Ct. 2574, 2582 (1975) (reasonable suspicion arises when law enforcement officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion"). That both Officer Tosado and Sergeant Hoare instinctively exited the car immediately after the defendant's response (Tr. 27, 71), underscores that the

Officers all were thinking the same thing – they were dealing with a person who might be carrying a firearm and thus might be dangerous.

In short, the testimony at the hearing established that: (i) the arrest took place at night in a high crime area; (ii) the area where the Officers first noticed the defendant was well-lit; (iii) the Officers first noticed the defendant because he was walking in a stiff, rigid manner, suggesting to the Officers that he might be attempting to conceal something on the left side of his body; (iv) as the Officers observed the defendant, his furtive movements continued; (v) upon seeing the Officers, the defendant appeared nervous; and (vi) after one of the Officers asked the defendant a question, the defendant offered an odd, dismissive response, turned the left side body away from the Officers, began to walk away with a quickened pace, and, most significantly, immediately reached for the exact area that the Officers had observed him favoring, suggesting to the Officers that the defendant might be trying to grab for something.

These facts, explored in detail at the hearing, are more than sufficient to meet the "rather lenient" test, United States v. Santana, 485 F.2d 365, 368 (2d Cir. 1973); see also United States v. Oates, 560 F.2d 45, 63 (2d Cir. 1977) (describing test as "not a difficult one to satisfy"), for concluding that the Officers had reasonable suspicion that the defendant was engaged in criminal conduct, namely, possession of a firearm. It follows that the Officers were entitled to conduct a protective frisk to determine whether the defendant in fact did possess a firearm. See Terry, 392 U.S. at 27, 88 S. Ct. at 1883 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."); Adams v. Williams, 407 U.S. 143, 149, 92 S. Ct. 1921, 1923 (1972) ("So long as the officer is entitled to make a forcible stop, and

has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."); see also Sept. 24, 2007 Gov't Ltr. at 5-6 (citing cases where courts found reasonable suspicion based on similar circumstances). A narrowly tailored pat-down search is exactly what Sergeant Hoare performed, as the defendant himself conceded. (Tr. 88-89 (defendant testified that Sergeant Hoare immediately patted the area where the firearm was located)).

The defendant's argument centers on the fact that Lieutenant McMahon never specifically testified that what he thought the defendant was "grabbing" for was a gun. This argument falls flat, for two reasons. First, the defendant conveniently ignores Officer Tosado's testimony that "[b]ecause the way he was acting, it appeared to us he had a weapon on him." (Tr. 71).

Second, the law requires only that officers provide "articulable facts" from which a court can determine whether the officers' actions were objectively justified. See Terry, 392 U.S. at 27, 88 S. Ct. at 1883 (officer need not be absolutely certain that the suspect is armed; but rather, may conduct the protective search if a reasonably prudent man in the officer's position "would be warranted in the belief that his safety or that of others was in danger"); see generally Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996) (noting that district court judges, as well as law enforcement officers, are entitled to draw inferences from findings of historical fact). Notwithstanding the litany of judicial authorities cited by the defendant, he does not direct the Court to a single case supporting his argument that the evidence should be suppressed because Lieutenant McMahon did not spell out with precision the inference he drew from the facts he articulated during the hearing.

9

In the majority of the defendant's cases, the courts held simply that the facts articulated by the officers did not give rise to reasonable suspicion either that criminal activity was afoot or that the subject might be dangerous. For example, in Sibron v. New York, 392 U.S. 40, 88 S. Ct. 1889 (1968), the officer's sole purpose in searching the defendant's pockets – without a preliminary pat-down – was to search for narcotics; he did not fear that the defendant was armed. Id. at 65, 88 S. Ct. at 1904 ("His testimony shows that he was looking for narcotics, and he found them."). See also, e.g., United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) (traffic violation justified stop but did not give rise to concern for officers' safety sufficient to justify frisk; nor did defendant's "reaching movement toward the center console", as that movement was consistent with reaching for a license or registration, "a perfectly lawful action that is to be expected when one is pulled over by the police"); United States v. Davis, 94 F.3d 1465, 1469 (10th Cir. 1996) (reasonable suspicion that defendant possessed firearm was not supported by fact that defendant kept hands in his pockets on cold night, where there was no evidence of bulge or that defendant appeared to be hiding anything).[4]

The defendant also cites cases in which the articulated facts did not, on their face, support a reasonable inference of criminal activity and thus required interpretation by an experienced law enforcement agent. For example, in United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999), the court held that the agent who conducted a search of a package – but did not even testify at the

---

[4] The Defendant cites United States v. Parker, No. 99 Cr. 123, 1999 WL 997282, at *2, 6-7 (E.D.N.Y. Oct. 18, 1999) (defendant had not engaged in suspicious activity prior to turning his body and touching his waistband upon seeing police, and incident did not take place in high crime area), which the Government addressed in its pre-hearing letter. See Sep't 24, 2007 Gov't Ltr. at 6, n.1. See also United States v. Padilla, No. 06 Cr. 824, 2007 WL 1958894, at *8 n.4 (E.D.N.Y. June 29, 2007) (distinguishing Parker).

hearing – should have explained why, based on his experience, he suspected that a package contained contraband. Johnson involved a series of facts that were not so obviously suspicious as to give rise to a "rational inference" without explanation from law enforcement agents. Id. The same cannot be said for the facts articulated here.[5]

None of the defendant's cases suggest that so long as the facts articulated by the officers give rise to the rational inference that criminal activity may be afoot, the officer must meticulously connect the dots for the court and spell out the "rationale inferences" that can be drawn from those facts. See generally Wardlow, 528 U.S. at 125, 120 S. Ct. at 676 ("[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."); United States v. Scopo, 19 F.3d 777, 783 (2d Cir. 1994) ("The Supreme Court has, in fact, stressed that analysis of fourth amendment issues involves an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the time the challenged action was taken.") (internal quotations omitted).

Finally, the defendant faults the Officers for failing to "make any inquiry" of the

---

[5] Defendant also cites two New York state cases in an effort to minimize the significance of the defendant's "stiff arm". (Def. Br. at 12). Neither case merits serious consideration. The defendant relies on the dissenting opinion in People v. Nelson. See 102 A.D.d 765, 768, 477 N.Y.S.2d 295, 297 (1st Dep't 1984). In People v. Cooper, the court held that the officers' stated belief that a car passenger was armed was belied by the officers' own actions, including allowing the car to drive away before later stopping it. 844 N.Y.S.2d 546, 547, 17 Misc. 3d 44 (1st Dep't 2007). In any event, New York state law provides little guidance on the issue of Terry stops, as "the case law displays that New York actually affords greater protection to a suspect than does the federal Constitution. . . . For example, in New York, when less intrusive alternative means to assure an officer's safety are available, the officer must use those means." Dasher v. Hughes, No. 95 Civ. 3913 (WK), 2000 WL 726865, at *6 (S.D.N.Y. June 6, 2000).

defendant before frisking him. (Def. Br. at 20). The law is clear that an officer is not required to take intermediate measures when presented with a situation – such as this one – where the officer has a reasonable belief that an individual might be armed. See Terry, 392 U.S. at 33, 88 S. Ct. at 1886 (Harlan, J., concurring) ("Where such a stop is reasonable, however, the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence. . . . There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."); United States v. Alexander, 907 F.2d 269, 273 (2d Cir. 1990); United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987); United States v. Mireles, 583 F.2d 1115, 1117 (10th Cir. 1978).

## CONCLUSION

The Officers' conduct in conducting an investigatory stop of the defendant and frisking him for firearms did not violate the Fourth Amendment. Accordingly, the defendant's motion should be denied.

Dated:      New York, New York
            December 26, 2007

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney

                            By:     _____
                                    Lee Renzin
                                    Alexander J. Willscher
                                    Assistant United States Attorneys
                                    (212) 637-2723

## AFFIRMATION OF SERVICE

LEE RENZIN, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That, on December 26, 2007, I caused one copy of the within Post-Hearing Memorandum of Law of the United States of America in Opposition to Defendant's Motion to Suppress Evidence to be delivered by ECF and hand to:

> Mark B. Gombiner, Esq.
> Federal Defenders of New York, Inc.
> 52 Duane Street–10th Floor
> New York, NY 10007

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   New York, New York
         December 26, 2007

_____
Lee Renzin

13